UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MICHAEL WALKER,

                   Plaintiff,

                v.                              14-CV-680 (NRM) (PK)

THE CITY OF NEW YORK, GREGORY
GORDON, and MICHAEL SMITH,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR DEFENDANTS' SPOLIATION OF EVIDENCE

Elizabeth Geddes
Nadia Shihata
Shihata & Geddes LLP
155 Water St.
Brooklyn, NY 11201

TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 1

I.    The February 2, 2013 Shooting of Plaintiff by Defendants Gordon and Smith ................ 1

II.   Plaintiff's Requests for the Spoliated Evidence ........................................................ 7

ARGUMENT ........................................................................................................... 8

I.    Legal Standard .................................................................................................. 8

   A.   Destruction of Physical Evidence ................................................................... 8

   B.   Destruction of Electronically Stored Information ........................................... 9

II.   Analysis ........................................................................................................... 10

   A.   Defendants Admit They Failed to Preserve Relevant Evidence ................................. 10

   B.   Defendants Had an Obligation to Preserve the Spoliated Evidence.......................... 13

   C.   Defendants Had a Culpable State of Mind .................................................... 15

      i.   Defendants Smith and Gordon's Text Messages ....................................... 15

      ii.   Smith's Memo Book ........................................................................ 22

   D.   The Destroyed Evidence Was Relevant........................................................ 22

   E.   Severe Disciplinary Sanctions Are Warranted.............................................. 23

CONCLUSION......................................................................................................... 25

TABLE OF AUTHORITIES

***Cases***

*Adorno v. Port Auth.*, 258 F.R.D. 217 (S.D.N.Y. 2009) ...................................................... 9

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   138 F. Supp. 3d 352 (S.D.N.Y. 2015) ........................................................... 9, 22

*Dilworth v. Goldberg*, 3 F. Supp. 3d 198 (S.D.N.Y. 2014) ........................................... 10

*Harkabi v. SanDisk Corp.*, 275 F.R.D. 414 (S.D.N.Y. 2010) ........................................ 9

*Hawley v. Mphasis Corp.*, 302 F.R.D. 37 (S.D.N.Y. 2014) ......................................... 9

*In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297 (S.D.N.Y. 2013) .................................... 9

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) ................. 8

*Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620 (2d Cir. 2018) ............................ 8, 13, 22

*La Belle v. Barclays Cap. Inc.*, 340 F.R.D. 74 (S.D.N.Y. 2022) ............................... 10, 13

*Matteo v. Kohl's Department Stores, Inc.*, 2012 WL 760317 (S.D.N.Y. Mar. 6, 2012) ............... 14

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) .................... 9, 23

*Rhoda v. Rhoda*, 2017 WL 4712419 (S.D.N.Y. Oct. 3, 2017) ........................................ 10

*Siggelko v. Kohl's Dep't Stores, Inc.*, 2009 WL 750173 (E.D.N.Y. Mar. 17, 2009) ................. 15

*Simoes v. Target Corp.*, 2013 WL 2948083 (E.D.N.Y. June 14, 2013) ............................... 15

Taylor v. New York, 293 F.R.D. 601 (S.D.N.Y. 2013) ............................................... 14

*Williams v. N.Y.C. Transit Auth.*, 2011 WL 5024280 (E.D.N.Y. Oct. 29, 2011) .................... 9

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) .................................... 9

***Rules***

Fed. R. Civ. P. 37(e) ........................................................................... 8, 15

Pursuant to the Court's inherent authority and Fed. R. Civ. P. 37(e), Plaintiff moves for sanctions for Defendants' intentional failure to preserve certain documents, including Defendant Michael Smith's memo book, text messages between Smith and a confidential informant ("CI") and text messages between Smith, Defendant Gregory Gordon and other New York City Police Department ("NYPD") officers about the events of February 2, 2013. For the reasons set forth below, severe disciplinary measures are warranted.[1]

<u>BACKGROUND</u>

I.    <u>The February 2, 2013 Shooting of Plaintiff by Defendants Gordon and Smith</u>

On February 2, 2013, following a stop predicated on information supplied by the CI, Smith and Gordon, who were then both NYPD officers assigned to the now-disbanded Anti-Crime Unit in the 120 Precinct in Staten Island, shot at Plaintiff Michael Walker. One of those bullets struck Mr. Walker in the back. As relevant to this motion, the circumstances that led to the shooting of Mr. Walker are set forth briefly below.

At approximately 9:30 p.m. on February 2, 2013, the CI tried to contact his NYPD "handler," Sergeant John Tancredi, to report that an individual purportedly had a firearm and intended to commit a robbery. (DEF001906). When Sgt. Tancredi did not answer his phone, the CI called 9-1-1 and then 3-1-1. (*Id.*; 7030776_1.wav[2]). At 9:40 p.m., the CI connected with Detective Richard Dinkle at the 120 Precinct, who prepared a DD5 documenting his call with the CI and the steps he took thereafter. According to the DD5, following his call with the CI, Det. Dinkle told Smith that the CI would be with a "possible perp from the past wanted for a gun

---

[1]    Counsel for Plaintiff has consulted with counsel for Defendants but we are unable to resolve the matter without Court intervention.

[2]    Defendants disclosed several audio recordings. Because those recordings were not Bates-numbered, they are identified herein with their file name.

point Robbery" and directed Smith to contact the CI. (DEF002237). As further detailed below, Smith and the CI then communicated orally by telephone and via text message. Once Sgt. Tancredi became aware that the CI had information to provide, he took over communications with the CI, including by text messages, and thereafter relayed certain information to Smith and others. (6909982_1.wav). Other NYPD officers who participated in the stop of Mr. Walker also exchanged text messages with Smith and Gordon in the lead up to the shooting. (7030858_1.wav; DEF1018).

At approximately 11:20 p.m. that evening, Gordon drove in an unmarked police vehicle, along with Smith and NYPD officer Christopher Annis, to the intersection of Treadwell and Charles Avenues in Staten Island, where they saw the CI and Mr. Walker standing on the northeast corner of the intersection. (6910153_1.wav). When the officers approached, Mr. Walker ran northbound along the east sidewalk on Treadwell Avenue. (*Id.*). Smith and Gordon gave chase, with Smith running on the east sidewalk and Gordon running in the street. Smith claims that, as they were running, (1) Mr. Walker turned around and, using his right hand, pointed a black firearm at Smith; and (2) Smith then fired one shot at Mr. Walker, which missed him, after which Mr. Walker continued to run northbound along the sidewalk.[3] (*Id.*).

Gordon claims that he also saw Mr. Walker point a firearm at Smith and that, after Smith shot at Mr. Walker, Gordon saw Mr. Walker turn his torso to the left, raise a black firearm and point it towards Gordon, who was still running in the street, after which Gordon shot at Mr. Walker. (*Id.*). Gordon next claims he then saw Mr. Walker throw the black firearm over his shoulder after he was hit by Gordon's bullet. Gordon stated he knew he struck Mr. Walker

---

[3]     In an audio-recorded interview with CCRB investigators, Defendant Smith also claimed that he saw an unspent round eject from Mr. Walker's firearm. He said that Mr. Walker "pulled a black firearm from his waist, pointed it at me, I did see a round fall from his firearm, he started to run, shots were fired…." (201303526_20150324_1100.dss).

because he saw feathers fly from Mr. Walker's coat, but claimed that Mr. Walker continued to run after being shot for approximately "three to four more steps" or "10 to 15 feet." (Gordon June 27, 2017 Tr. 15; 6910153_1.wav).

Aside from the CI, two other civilian witnesses, Individual #1 and Individual #2, witnessed events relevant to the shooting. Individual #1 resided at 170 Treadwell Avenue and was sitting on her porch that evening, watching one of the season's first snowfalls. She saw police cars turn onto Treadwell Avenue and stop their cars, and then saw a young Black man (*i.e.*, Mr. Walker) running northbound on Treadwell Avenue, with one or more officers chasing him. (Individual #1 Jan. 11, 2024 Tr. 4, 31, 32). When Mr. Walker was nearing the corner of Treadwell and Castleton Avenues, she saw a police officer shoot Mr. Walker in the back and Mr. Walker fell to the ground. (*Id.* 38, 40). She then heard a Sergeant ask the police officer who had shot Mr. Walker (*i.e.*, Gordon), in substance, "How are you going to explain that?", which she understood to be an inquiry as to how Gordon was going to justify his shooting a fleeing Mr. Walker in the back given that he posed no apparent danger to the officers or the community. (*Id.* 41-42). Significantly, Individual #1 watched Mr. Walker as he ran down Treadwell Avenue and at no time did she see him possess a gun or turn his head or his body towards the officer chasing him. (*Id.* 112-13; Individual #1 Oct. 25, 2023 Aff. ¶ 9).

Individual #2 also was present while Mr. Walker ran northbound along Treadwell Avenue. (7031827_1.wav). Individual #2 advised that he got off a New York City bus on Castleton Avenue and walked southbound (*i.e.*, towards Charles Avenue and in the opposite direction of Mr. Walker and Defendants Gordon and Smith) along the west sidewalk of Treadwell Avenue. (*Id.*). Individual #2 was wearing headphones so his hearing was impaired, but he saw a white male in the street (*i.e.*, Gordon) shoot at an individual on the sidewalk, causing Individual #2 to

run. (*Id.*). Shortly after one or more shots were fired, Officer Annis and another officer stopped and searched Individual #2 at the corner of Taylor Avenue and Charles Avenue. (*Id.*). The officers released Individual #2 hours later upon determining he had no connection to the CI or Mr. Walker. (*Id.*). Individual #2 told the NYPD later that same evening that "he did not observe[] any weapon on the male running along the sidewalk[.]" (DEF001843).

Ballistics evidence was later recovered from Treadwell Avenue. At a suppression hearing in Mr. Walker's criminal case, NYPD officer Michael Diario testified that he saw a black firearm and an unspent round in the driveway of 165 Treadwell Avenue. (DEF01105). A crime scene unit ("CSU") recovered (i) a firearm and an unspent round in the driveway of 165 Treadwell Avenue (on the east side of Treadwell Avenue), (ii) a shell casing in the street, north of 163 Treadwell Avenue (one house north of 165 Treadwell Avenue) and approximately two car lengths in front of the driveway where CSU recovered the firearm, and (iii) a shell casing on the sidewalk in front of 173 Treadwell Avenue, also on the east side of Treadwell Avenue and south of the driveway where CSU recovered the firearm and unspent shell casing. (DEF0830).

RUMC medical records show that Mr. Walker sustained bullet wounds on his right back and his right axilla (*i.e.*, his right underarm), but do not specify which of the two wounds was an entrance wound or which was an exit wound. (DEF000304). CSU, however, recovered the down jacket and other clothing that Mr. Walker was wearing when shot, including a sweater, t-shirt and tank top (DEF0691 - DEF0700), which, upon inspection, feature only one single bullet hole: a small round hole on the ***back*** of each of the articles of clothing. Furthermore, the right underarm of Mr. Walker's jacket contained what appeared to be blood but no bullet holes. From his examination of Mr. Walker's clothing, Plaintiff's ballistics expert has concluded that "the series of holes found in the upper back area of the garments worn by Mr. Walker during this shooting

4

are bullet entrance holes and are the result of a bullet initially striking Mr. Walker in the upper

back area." Expert Report of George G. Krivosta at 3.[4]

Despite the definitive conclusion to be drawn from the examination of Mr. Walker's

clothing, in the immediate aftermath of the shooting, as described below, the NYPD has falsely

and repeatedly insisted not only that Mr. Walker was ***not*** shot in the back, but also that he fired

first at officers, even though the ballistics evidence recovered from the scene also definitively

proves otherwise. In the Final Summary Report of the Firearm Discharge Review Board, the

Chief of Department wrote that Plaintiff "was treated for a gunshot wound that entered the left

side of his torso and exited his back." (DEF0393). Medical records from the hospital where Mr.

Walker was treated indicate that NYPD officers with Mr. Walker when he was admitted to the

hospital went even further. Those records include the following notation: "[a]s per police officers

accompanying [patient], [patient] fired upon cops, cops returned fire and patient was struck."

(DEF000276). And, during sworn testimony before a Staten Island grand jury, which the grand

jury relied on to return a criminal indictment against Mr. Walker, Sgt. Mitchell testified falsely

when questioned by the Assistant District Attorney:

> Q    Do you know if the individual [i.e., Mr. Walker] turned and
>      fired his gun at Officer Gordon? Was he hit?
> A    Yes, I believe so. Officer Gordon at that time ***returned fire***.
>      He ran a little bit, but he was stumbling. He ran another 10,
>      15 feet.

---

[4]    Significantly, notwithstanding that both the NYPD and the CCRB purportedly conducted investigations into the shooting of Mr. Walker, it does not appear that ***any*** law enforcement investigator ever inspected the clothing. Indeed, the property was secured immediately after the shooting and sent to a warehouse for safekeeping; the property was moved to a second warehouse in 2014, but was not otherwise distributed or examined until April 17, 2024, when Plaintiff's expert inspected the clothing.

(Walker000007 (emphasis added)). From the beginning, it is clear that NYPD officers colluded to create and sustain a false narrative in an effort to absolve themselves of any liability or blame for shooting a fleeing Mr. Walker in the back.

Significantly, Smith had a prior history with Mr. Walker and a motive to retaliate against him. In 2008, Smith arrested Mr. Walker and claimed that he assaulted and injured the arresting officers, including Smith, during that arrest. (DEF003509). According to court documents, the arresting officers alleged that Mr. Walker struck one officer's face with a closed fist, caused one officer to break her arm bone, and caused Smith to sustain soft tissue damage to his hand and lacerations to both of his arms. (*Id.*). In light of Smith's prior interaction with Mr. Walker in 2008, Smith – and by extension Defendant Gordon – had a strong motive to shoot Mr. Walker in the back without any provocation. Their accounts that they did not shoot an unarmed Mr. Walker are also exceedingly suspect.

- First, they are directly contradicted by the firsthand account of Individual #1, a wholly disinterested party. She saw Gordon shoot an apparently unarmed Mr. Walker in the back without any provocation by Mr. Walker and saw Sergeant Mitchell respond incredulously (before the officers had time to craft their coverup).
- Second, Smith and Gordon's statements are wholly contradicted by the above-described crime scene evidence that definitively shows that Gordon shot Mr. Walker in the back.
- Third, the location of the shell casing in the street shows that Gordon likely shot at Mr. Walker at a location slightly north of the shell casing and therefore that it would have been extraordinarily difficult, if not impossible, for Mr. Walker who was, according to Gordon, even further north of Gordon, to throw a firearm over his shoulder such that it landed in the driveway of 165 Treadwell Avenue, a feat that would have required the firearm to defy physics and boomerang around the corner of the house at 163 Treadwell Avenue and land perfectly on the snow in the driveway of 165 Treadwell Avenue.
- Fourth, Smith's credibility is further undermined by his statement to CCRB that he saw an unspent round eject from Mr. Walker's firearm before he fired at Mr. Walker, given that the only recovered unspent round was found in the same location where the firearm was purportedly found, i.e., well north of the location where Mr. Walker was situated when Smith fired a shot at Mr. Walker.

6

- Finally, Smith and Gordon's apparent fabrication of Mr. Walker's actions is strongly supported by an Instagram post by Gordon (attached hereto as Exhibit A) where he overtly references the importance of "loyalty" and "st[anding] strong" (Ex. B),[5] a not so subtle reference to the unwritten code among some law enforcement officers to protect each other above all else, including telling the truth.

II.   <u>Plaintiff's Requests for the Spoliated Evidence</u>

Discovery in this matter began in or about 2015 following a stay due to the pending criminal matter against Mr. Walker. In September 2015, Plaintiff requested "[a] copy of all documents relating to the incident alleged in the Complaint, including, without limitation: … witness statements, … memo book entries[,] … other documents concerning the defendants' activities on February 2, 2013[.]" (A copy of Plaintiff's request is attached as Exhibit B). Documents were defined to include "written, typed, printed, recorded … statements, communications or other matters …" (*Id.*). The request further stated that "[i]f any document responsive to this request exists in the form of a tape recording, video recording, or other electronic recording, it shall be preserved until the conclusion of the litigation." (*Id.*). Finally, the instructions provided, "[i]f defendants assert that responsive materials have been lost, destroyed, or are otherwise unavailable, it shall identify the documents produced pursuant to Local Rule 47[b][4] and state in a sworn writing [a] the circumstances of each item's unavailability and [b] efforts made to locate them." (*Id.*).

Though clearly responsive, Defendants did not produce any entries from Smith's memo book for February 2, 2013 or any text communications authored or received by Smith or Gordon related to the shooting and arrest of Mr. Walker. Defendants also did not identify any responsive documents as having been lost, destroyed or otherwise unavailable.

---

[5]     Gordon wrote, "3 years ago today we were tested. And stood strong. Brothers for life @saintshockey_nyc Blood doesn't make you family. Loyalty does #brothers #family #igotyoursix [2 American flag emojis]." (Exhibit B).

In August 2023, Plaintiff (now represented by new counsel) reiterated his request to Defendants to produce the text messages of Smith and Gordon. At that time, Defendants informed Plaintiff that these text messages no longer exist. Plaintiff tried to subpoena records for telephone numbers for Smith, Gordon and the CI, but Smith no longer recalled his telephone number (although he did recall that his provider was AT&T). Without Smith's number, AT&T – the only service provider known to retain records from 2013 – had no records to produce.

<u>ARGUMENT</u>

I.    <u>Legal Standard</u>

Two slightly different legal standards govern the Court's evaluation of the destruction of physical evidence and electronic evidence. The former is governed by the common law, while the latter is governed by Fed. R. Civ. P. 37(e).

A.    <u>Destruction of Physical Evidence</u>

Spoliation is the "destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (quotations omitted). Pursuant to a court's inherent authority, sanctions are warranted when a party shows "by a preponderance of the evidence: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quotation marks and citation omitted). The party seeking sanctions for spoliation has the burden of

8

establishing the elements of a spoliation claim. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

A party has a culpable state of mind when he destroys evidence knowingly or negligently. *Id.* at 108. In the discovery context, negligence is a "failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (quoting *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418-19 (S.D.N.Y. 2010)). Courts in this Circuit have concluded that "once the duty to preserve attaches, any destruction is, at a minimum, negligent." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 388-89 (S.D.N.Y. 2015) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)); *see, e.g.*, *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 49 (S.D.N.Y. 2014) (same).

To satisfy the final prong, "the innocent party may provide sufficient evidence that would tend to show that the lost documents would have been favorable to [its] case." *Williams v. N.Y.C. Transit Auth.*, No. 10–CV–882, 2011 WL 5024280, at *8 (E.D.N.Y. Oct. 29, 2011) (internal quotation marks omitted); *see also Adorno v. Port Auth.*, 258 F.R.D. 217, 228 (S.D.N.Y. 2009) ("Although the burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, ... when the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party.") (citations and internal quotation marks omitted).

B.    Destruction of Electronically Stored Information

Fed. R. Civ. P.37(e) separately provides for sanctions where electronically stored information was not properly preserved:

9

> If electronically stored information that should have been
> preserved in the anticipation or conduct of litigation is lost because
> a party failed to take reasonable steps to preserve it, and it cannot
> be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the
> information, may order measures no greater than necessary to cure
> the prejudice; or (2) only upon finding that the party acted with the
> intent to deprive another party of the information's use in the
> litigation may: (A) presume that the lost information was
> unfavorable to the party; (B) instruct the jury that it may or must
> presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.[6]

II.   <u>Analysis</u>

A.   <u>Defendants Admit They Failed to Preserve Relevant Evidence</u>

"As a threshold matter, a party seeking spoliation sanctions must necessarily show that the evidence at issue actually existed." *La Belle v. Barclays Cap. Inc.*, 340 F.R.D. 74, 82 (S.D.N.Y. 2022) (citing *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (collecting cases)). As set forth below, both Smith's memo book entries and the text messages Smith and Gordon sent and received (1) previously existed; and (2) included information provided by the CI and about the CI.

With respect to the memo book, the relevant section of the NYPD Patrol Guide (two iterations of which are attached hereto as Exhibit C) requires uniformed officers, including those attired in plain-clothes, to maintain an activity log that records certain components of each tour an officer serves. (*See* Ex. C). Specifically, it requires officers to document, *inter alia*, assignments received, tasks performed and "information pertinent to an assignment or observed/suspected violation of law, *i.e.*, action taken, narrative disposition, forms prepared with

---

[6]   While Rule 37(e) did not become effective until December 1, 2015 (after the beginning of discovery in this matter), Chief Justice John Roberts included an Order when transmitting the new Rule to Congress explaining that "the foregoing amendment to Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern ... insofar as just and practicable, all proceedings then pending." *Rhoda v. Rhoda*, 2017 WL 4712419, at *2 (S.D.N.Y. Oct. 3, 2017) (quoting 2015 U.S. Order 0017).

identifying serial number, etc." (*Id.*). During a June 6, 2024 deposition, Smith testified that he maintained a memo book on February 2, 2013 and that in his memo book, he would have documented information provided by the CI (although he would not have included any of the CI's identifying information). (Smith June 6, 2024 Tr. 73).

With respect to the text messages, Smith has repeatedly admitted that on February 2, 2013, he communicated with the CI both orally by phone and in writing by text message. In a March 24, 2015 audio-recorded interview with the CCRB, Defendant Smith provided the following information:

> Q     And was there continued communication with the CI up to
>        that point?
> A     Yeah.
> Q     What was that communication?
> A     Um, a few calls and then a text that actually stated that, um,
>        just a heads up, he did say he was going to fire if you guys
>        attempted to stop him.

(201303526_20150324_1100.dss). A few days later, when he was next interviewed by NYPD's Staten Island Investigations unit on April 1, 2015, Defendant Smith made clear in another audio-recorded interview that he exchanged additional text messages with the CI:

> Q     So Dinkle gave you the number to the CI.
> A     Yes.
> Q     Okay. Keep going.
> A     After that, a few texts were exchanged. Said he was on his
>        way, they were gonna be in a vehicle.
> Q     Texts between you and the CI?
> A     Me and the CI.
>                              ***
> A     The last message I got from the CI was a text that said, the
>        kid is armed and he said he was going to shoot it out with
>        police if anyone intends to stop him.

(6909982_1.wav). Then again, on June 20, 2017, when Defendant Smith was first deposed in this action, he testified:

> Q      In what manner were you contacted by the criminal informant?
> A      Telephone, cell phone.
> Q      Was that audio or some other manner?
> A      It was audio and text.

(Smith June 20, 2017 Tr. 13; *see also* Smith June 6, 2024 Tr. 36 (acknowledging he exchanged "maybe one or two" text messages with the CI)).

In recorded interviews and in his deposition testimony, Smith described one of the text messages the CI sent to Smith. He self-servingly claimed that the CI relayed by text message that Mr. Walker would "shoot it out with the police if he is stopped" and that Smith then "told everybody just be careful, he said he will shoot it out with the police if he's stopped by police." (Smith June 20, 2017 Tr. 39-40; Smith June 6, 2024 Tr. 36-37; *see also* 6909982_1.wav; 201303526_20150324_1100.dss). As described below, Smith's claim about the content of this text message, however, is not credible.

There is also strong evidence that Defendants Smith and Gordon communicated with other officers about the planned stop of Mr. Walker. In his interview at the 120 Precinct on February 3, 2013, just a few hours after the shooting, Officer Sepulveda, who acted as Sgt. Tancredi's driver on February 2, 2013, reported that, at approximately 10:05 p.m., he received a "text message" on his cell phone from Smith, in which Smith stated that he received information from a CI about a robbery. (DEF1018 (attached hereto as Exhibit D)). Another officer who participated in the stop of Mr. Walker told Staten Island Investigations in a recorded interview on February 3, 2013 that he exchanged several text messages with Gordon on February 2, 2013 and read aloud at least some of those text messages, including "It's Gordon" (sent at 10:23 p.m.), "You get my text" (sent at 10:23 p.m.), "Yep" (sent at 10:23 p.m.), "Got it now" (sent at 10:23

12

p.m.), "It's Gordon" (sent at 10:24 p.m.) and "Ok, waiting on car info" (sent at 10:24 p.m.). (7030858_1. wav).

B.   <u>Defendants Had an Obligation to Preserve the Spoliated Evidence</u>

For both physical evidence and electronically stored information, Plaintiff must establish that Defendants had an obligation to preserve the spoliated evidence. *La Belle*, 340 F.R.D. at 81 ("Although Rule 37(e) does not specifically address the first element of spoliation, courts have recognized that the standard for showing that a party had an obligation to preserve evidence is the same for both ESI and non-ESI."). Here, Defendants had a clear obligation to preserve their memo books and text communications related to the February 2, 2013 shooting and arrest of Michael Walker.

"A party has an obligation to preserve evidence within its control that attaches when the party knows, or reasonably should know, that the evidence is relevant to litigation or may be relevant to future litigation." *Lekomtsev v. City of New York*, 2020 WL 5878258, at *3 (E.D.N.Y. Oct. 2, 2020) (citing *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001), and *Klipsch Grp., Inc.*, 880 F.3d at 628). *See also Alter v. Rocky Point Sch. Dist.*, 2014 WL 4966119, at *8 (E.D.N.Y. Sept. 30, 2014) ("The duty to preserve arises, not when litigation is certain, but rather when it is "reasonably foreseeable.") (citations omitted)). This obligation requires a litigant to "take affirmative steps to prevent inadvertent spoliation[,]" including identifying "all sources of potentially relevant evidence and implement[ing] a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015).

13

Here, Defendants knew or reasonably should have known that litigation was imminent after they shot Mr. Walker on the evening of February 2, 2013, when the NYPD initiated an internal review of the shooting. In accordance with procedure, the NYPD seized Defendants' firearms and conducted a breathalyzer examination of each of them, putting them on clear notice of their obligation to preserve all relevant evidence. Defendant Gordon readily acknowledged as much in his deposition testimony:

> Q   And was it your understanding that the NYPD would be conducting an investigation because this was a police involved shooting?
>
> A   Absolutely. Yes, ma'am.

(Gordon July 18, 2024 Tr. 42). Furthermore, as police officers, Defendants Smith and Gordon knew of their obligation to preserve their memo books and relevant text communications for the criminal prosecution of Mr. Walker that they themselves set in motion when they arrested him, as both constituted material discoverable under *People v Rosario*, 9 NY2d 286 (1961), and *Brady v. Maryland*, 373 U.S. 83 (1963).[7] (Gordon July 18, 2024 Tr. 42-44).

In *Taylor v. City of New York*, a district court held that the New York City Department of Corrections ("DOC") had a duty to preserve evidence that arose within a week of an assault of an inmate in its custody that resulted in the inmate's hospitalization with a broken jaw. 293 F.R.D. 601, 610 (S.D.N.Y. 2013). The court held that at the time of the assault, the DOC knew that litigation "invariably ensued" from such assaults. In so holding, the court analogized the case to those where individuals were injured in department stores. *Id.* (citing *Matteo v. Kohl's Department Stores, Inc.*, 2012 WL 760317 (S.D.N.Y. Mar. 6, 2012) (holding that even though an injured plaintiff had waited ten months before filing a claim and despite the fact that the

---

[7]   At the very least, Defendants were on notice by the time that Plaintiff filed a Notice of Claim with the City on May 3, 2013. (DEF000021-DEF000022).

defendants only retained video surveillance footage for sixty days, "there [was] little doubt that, at the time of the accident, [d]efendants could have expected [p]laintiff to file a lawsuit"); *Simoes v. Target Corp.*, 2013 WL 2948083, at *3 (E.D.N.Y. June 14, 2013) (holding that the duty to preserve video surveillance footage attached "[o]n the same day as the incident [because] Target had knowledge of the [plaintiff's] slip and fall, ... and [also knew] that there was liquid on the floor where plaintiff fell"); *Siggelko v. Kohl's Dep't Stores, Inc.*, 2009 WL 750173, at *3 (E.D.N.Y. Mar. 17, 2009) ("Assuming that Plaintiff suffered some injury, Kohl's could have anticipated that Plaintiff would file a lawsuit shortly thereafter.")). This case is no different. Mr. Walker sustained significant injuries following Defendants' shooting of him on February 2, 2013 and it is well known that such shootings axiomatically give rise to lawsuits such as the one brought by Mr. Walker.

C. <u>Defendants Had a Culpable State of Mind</u>

Defendants also had a culpable state of mind when they destroyed (i) the text messages exchanged with the CI and other officers, and (ii) Smith's memo book.

i. <u>Defendants Smith and Gordon's Text Messages</u>

Defendants failed to preserve the text messages with the intent to deprive Plaintiff of the information's use in this litigation. Fed. R. Civ. P. 37(e). While Defendants will of course deny that they acted with such intent, a *pro forma* denial is insufficient to end the inquiry, particularly given the circumstances of this case. As detailed below, Defendants' intent is supported by (a) the record of manufacturing evidence in this case, (b) Defendants' incredible counternarrative, and (c) Gordon's Instagram post about the shooting.

a.   NYPD's Demonstrated Record of Manufacturing Evidence

Significantly, as detailed below, the NYPD has a demonstrated record of manufacturing evidence in this case in a transparent attempt to shield its officers from potential liability. Specifically, Sgt. Tancredi prepared an informational report purportedly documenting his communications with the CI that contained manufactured evidence. In his report, Sgt. Tancredi wrote:

> On the above date at approximately 2311 hours the undersigned received a text message from the CI informing the undersigned that JD 'Shooter' had a firearm to *which he removed from his waistband, and charged a round into the chamber*. CI # 13-000098 requested the undersigned to move-in quickly *in fear for what JD 'Shooter' was about to do next*.

Complaint Follow-Up Informational, dated Feb. 3, 2013 (emphasis added) (attached hereto as Exhibit E).[8]

Yet when Sergeant Tancredi was interviewed by Staten Island Investigations on February 3, 2013, the investigators asked to see the text messages he exchanged with the CI and took photographs of those messages. Glaringly, there is no message that *in any way* reflects that the CI communicated that the alleged suspect "removed [the firearm from] his waistband"; "charged a round into the chamber" or "feared what [the alleged suspect] was about to do next."[9] To the contrary, the text messages show only the following dialogue between Sgt. Tancredi and the CI.

> Sgt. Tancredi:  You walkin?
> CI:                    Im walking up post now with herrt up and come
> Sgt. Tancredi:  They got stEel

---

[8]      Defendants did not disclose to Plaintiff a copy of the informational report until immediately before Sgt. Tancredi's deposition and even then, conditioned the disclosure on Plaintiff's attorneys not deposing Sgt. Tancredi about it. Accordingly, Plaintiff has never had an opportunity to depose Sgt. Tancredi about the falsified report.

[9]      Sgt. Tancredi testified in a deposition on February 15, 2024 that he photographed all of his communications with the CI on February 2, 2013. (Tancredi Feb. 15, 2024 Tr. 50). Unlike Smith and Gordon, Sgt. Tancredi communicated with the CI on an NYPD-issued cell phone. (*Id.* 19-20).

16

Sgt. Tancredi:   steel ?
CI:                    Yes
CI:                    Were u at
CI:                    Were u at?

(DEF001875 - DEF001884) (attached hereto as Exhibit F). Another document that was provided

to Mr. Walker in his criminal case revealed the times of each of those messages. According to

that document, the CI did send a text message at 11:11 p.m., the time when Sgt. Tancredi claimed

the CI sent the text messages listed in his informational report, but all the text said was "Im

walking up post now with herrt up and come." (Walker000001 (attached hereto as Exhibit G)). In

sum, Sgt. Tancredi's flagrantly false report about the content of the CI's text messages shows the

ease with which NYPD officers have fabricated evidence and supports the conclusion that in this

case, they intentionally spoliated evidence.

b.  Defendants' Incredible Counter-Narratives

At the outset and as described previously, the NYPD attempted to justify Defendants'

shooting Mr. Walker by falsely claiming that Mr. Walker fired at them, a claim that was wholly

debunked by witness accounts and ballistics evidence. Other claims such as Smith's statement

that he saw an unspent round eject from a firearm in Mr. Walker's possession were similarly

dubious given the crime scene evidence. In a similar vein, Defendants Smith and Gordon have

offered a counternarrative about their communications with the CI, namely, that (a) they only

knew that they were going to stop the CI's "buddy," not Mr. Walker, against whom the NYPD –

and specifically Smith – had a motive to retaliate, and (b) the CI sent Smith a text message

warning him that Mr. Walker had purportedly conveyed his intent to shoot the officers if they

tried to stop him. But that counter-narrative is self-serving and, frankly, incredible, and itself

provides strong support that Smith and Gordon intentionally failed to preserve their text

messages.

17

i.   Defendants' Claims that the CI Failed to Describe Plaintiff
     as Anything other than "My Buddy"

First, the spoliated evidence would have shown how the CI described Mr. Walker. Of
course, had the CI identified Mr. Walker in a manner that allowed Smith to ascertain he was
about to stop Mr. Walker specifically – a man who Smith claimed had previously injured Smith
personally and his fellow NYPD officers – such evidence would support the contention that
Smith and Gordon had a motive to shoot an unarmed Mr. Walker in the back. To avoid this,
Smith has maintained that before he arrived at the stop location of Treadwell and Charles
Avenues, Smith did not know he was stopping Mr. Walker. In his March 24, 2015 recorded
interview with the CCRB, Smith insisted that the CI described Mr. Walker only as "my buddy"
and provided no other information from which Defendant Smith could have connected the
"buddy" to Mr. Walker. (201303526_20150324_1100.dss). And while in a recorded, compelled
interview in connection with NYPD's internal investigation of the shooting, Defendant Smith
acknowledged that he previously "had an incident with [Mr. Walker]," he insisted that he "**didn't
know it was him at the time**." (6909982_1.wav).

Notwithstanding Smith's statements, other evidence supports that Smith, in fact, had
more information about Mr. Walker than he has admitted. In his June 6, 2024 deposition, Smith
conceded that in his initial contact with the CI, it was critical for him to get as much information
about Mr. Walker as possible because he did not know whether he would have a second
opportunity to communicate with the CI. (Smith June 6, 2024 Tr. 47-50). For that reason alone, it
strains credulity to believe that Smith would *not* have asked the CI for identifying information
about Mr. Walker. That he did so is even more likely in light of a report drafted by Det. Dinkle,
where Det. Dinkle documented that he told Smith that the CI had information about a "possible

18

perpetrator from the past."[10] In so conveying that information, it is even more improbable that Smith would not have inquired further about Mr. Walker's identity and his prior interactions with the NYPD. Similarly, given the CI's eagerness to provide information (after all, before he communicated with Smith, the CI contacted Sgt. Tancredi, 9-1-1, 3-1-1, CrimeStoppers and the 120 Precinct), it is inconceivable that the CI would not have provided all the information that he had about Mr. Walker - even if it was just a purported nickname (i.e., "Shooter from the West"), as he later shared with Sgt. Tancredi, and that he knew he had been recently released from prison. Furthermore, when the CI finally started to communicate with Sgt. Tancredi, the CI immediately identified Mr. Walker as "Shooter from the West"; he certainly would have at least provided the same amount of information to Smith.

Lending further support to the conclusion that Defendants intentionally failed to preserve the text messages to spoliate evidence helpful to Plaintiff, an initial version of a memorandum supporting an award for Officer Smith for this very shooting included a paragraph that stated:

> [T]he perpetrator [*i.e.,* Mr. Walker] had been serving a 5 year prison term, from 2008-2012 (release to parole), as a result of resisting arrest; ensuing a 120 precinct SNEU arrest for CPCS3, in which he assaulted and broke the arm of one of the arresting officers. PO Smith was one of the arresting officer's [sic] involved in that 2008 arrest incident, ***and knew the violent propensity of the perpetrator.***

---

[10]     In his deposition, Detective Dinkle testified that in including that language, he "went by what [the CI] said to me." (Dinkle Mar. 12, 2024 Tr. 24). When asked whether the CI used the term "perp from the past," Detective Dinkle answered in the negative and hedged that he used the term to relay that the individual was "wanted" for a "gun point robbery." (*Id.*). Detective Dinkle, of course, is testifying about an event that occurred more than a decade earlier and no other officer has suggested that the CI ever reported that the perpetrator had a prior robbery conviction. Rather, the CI apparently reported that the perpetrator was planning to do a robbery. In context, it is far more likely that the CI reported to Detective Dinkle and Detective Dinkle relayed to Smith that the CI had prior interactions with the 120 Precinct leading Detective Dinkle to refer to him as a "possible perp from the past."

See DEF0656 (emphasis added). The NYPD conveniently, and intentionally, deleted this paragraph – which clearly supports that Smith knew precisely who Mr. Walker was before he shot at him – in the version of this document that was ultimately submitted for approval of the recognition. See DEF0650-52; DEF0653-55; DEF0657-63.

### ii.       The Fabricated Text Message

Defendants also had an interest in intentionally failing to preserve the messages to perpetuate their self-serving and unsupported claims that the CI told Smith by text message that Mr. Walker told the CI that he intended to shoot at the officers if he was stopped. After all, if they preserved the messages and no such message existed, the message's nonexistence would unequivocally demonstrate that Defendants fabricated this claim. Notably, in their statements to the CCRB and/or Staten Island Investigations, both Smith and Gordon stated that the CI communicated Mr. Walker's purported intention in this regard to Smith via text message.

Significantly, had the CI made such a claim to Smith, it would have been critical for Smith to convey that information to all of the officers who were in the caravan of cars involved in the stop of Mr. Walker. Indeed, in his earlier deposition testimony, Smith claimed that he did tell the officers about the piece of information he purportedly learned from the CI. (Smith testified that, in one of his text messages, the CI relayed that Mr. Walker would "shoot it out with the police if he is stopped" and that Smith "told everybody just be careful, he said he will shoot it out with the police if he's stopped by police." (Smith June 20, 2017 Tr. 39-40). Yet not a single officer or sergeant who was interviewed on the early morning of February 3, 2013 – just hours after the shooting – mentioned any such claim to those questioning them. Among those interviewed were Officer Annis who was in the car with Smith and Gordon when this text message was purportedly sent. He made no mention of any such warning. Neither did Sgt.

20

Tancredi - the CI's handler and the one who assumed communications with the CI. It was not until over two years later, in 2015, that Smith and Gordon first mentioned this seemingly critical text message when interviewed by the CCRB and NYPD's Staten Island Investigations unit.

Gordon's account is also inconsistent with other evidence. In a recorded interview in 2015, Gordon stated that "right before we approached both of the individuals," the CI sent a text message that "said something along the lines of 'If the police stop us, I'm shooting it out with them.'" (201303526_20150403_1005.dss). But according to Smith (and Tancredi), Tancredi had taken over communications with the CI by that time and therefore the CI would not have been texting Smith at that time.

c.   Instagram Post

Finally, Smith and Gordon's deliberate failure to preserve the text messages is strongly supported by an Instagram post by Gordon, in which Gordon wrote, "3 years ago today we were tested. And stood strong. Brothers for life @saintshockey_nyc Blood doesn't make you family. Loyalty does #brothers #family #igotyoursix [2 American flag emojis]." (Ex. B). In his June 6, 2024 deposition, Smith admitted that he had used the @saintshockey_nyc handle (Smith June 6, 2024 Tr. 58-59) and, in context, Gordon clearly was referring to Smith when he tagged the @saintshockey_nyc handle. Standing "strong" and "loyalty" are not so subtle references to the unwritten code among some in law enforcement to protect each other above all else, including telling the truth.

*** 

Considering the above evidence cumulatively, there is ample evidence to conclude by a preponderance that Defendants failed to preserve both Smith's text messages with the CI and

their text messages with other officers with the intent to deprive Plaintiff of such evidence's use in this litigation.

      ii.   <u>Smith's Memo Book</u>

For the same reasons, there is also sufficient evidence to conclude that Smith intentionally failed to preserve his memo book. Rule 37(e) does not apply to physical evidence such as Smith's memo book, however. As a result, Plaintiff need only show that Defendants acted negligently in failing to preserve the memo book. *See Residential Funding Corp.*, 306 F.3d at 108. Plaintiff easily meets that standard. Because Smith's duty to preserve those materials arose on February 2, 2013, he necessarily destroyed it after his duty to preserve attached and, accordingly, his doing so was negligent. *See Congregation Rabbinical Coll. of Tartikov, Inc.*, 138 F. Supp. 3d at 388-89.

Moreover, even if Smith's duty to preserve his memo book did not arise until Plaintiff filed a notice of claim with the City of New York (*i.e.*, May 3, 2013), a preponderance of the evidence shows that it was destroyed after that date. With respect to his memo book, Smith testified that he understood that the NYPD required him to maintain his memo books for a period of seven years. (Smith June 6, 2024 Tr. 21) In fact, the Patrol Guide requires uniformed members of service, a category in which Smith falls, to retain their memo books for the duration of their service with the NYPD and encourages them to keep the memo books even upon retirement. (Ex. C).

      D.   <u>The Destroyed Evidence Was Relevant</u>

The destroyed evidence is also "relevant" to Plaintiff's claim in "that a reasonable trier of fact could find" the spoliated evidence "would support" Plaintiff's claims. *Klipsch Grp., Inc.*, 880 F.3d at 628. For the reasons set forth above, it is clear that the memo book and text messages

22

documented information provided by the CI about Mr. Walker and his actions on February 2, 2013, all of which would have contributed to the officers' actions in stopping and shooting at Mr. Walker. Specifically, whether Smith knew in advance that he was going to stop Mr. Walker specifically is highly relevant because in the prior incident between Smith and Mr. Walker, Mr. Walker allegedly assaulted Smith and his fellow officers. As such, if Smith knew he was stopping Mr. Walker, he and others, including his partner Gordon, had a motive to retaliate against Mr. Walker, including by shooting him and framing him for possessing a firearm. Similarly, whether the CI in fact told Smith (he did not) that Mr. Walker told him that he would shoot if the police attempted to stop him is highly relevant. If the CI never sent such a text message (and the evidence demonstrates he did not), it tends to show that the defendants fabricated the text message to cover up their culpability.

     E.    <u>Severe Disciplinary Sanctions Are Warranted</u>

Given the egregious nature of Defendants' actions in spoliating this highly relevant evidence, the Court should impose severe disciplinary measures.[11] Indeed, Smith's failure to preserve his memo book alone – even assuming *arguendo* that it was simply a result of negligence and not bad faith – warrants an adverse inference instruction. *Residential Funding Corp.*, 306 F.3d at 108 ("[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence."). In light of the Patrol Guide's unequivocal instruction that officers maintain their memo books for the lifetime of their service at the NYPD and the recommendation that officers keep the books even upon retirement (Ex. C) and the near certainty that the memo book

---

[11]    In exchange for Defendants' agreement to reopen discovery in 2023, Plaintiff agreed not to seek the imposition of attorney's fees but reserved his right to seek the reimbursement of his costs. Given that Defendants' conduct required Plaintiff's counsel to conduct numerous depositions, Defendants should be required to reimburse Plaintiff for the costs associated with those depositions.

would be relevant to both a criminal matter (*People v. Walker*) and a civil matter (*Walker v. Smith*), it is stunning that Smith failed to preserve his memo book. In his June 6, 2024 deposition, Smith testified that he also lost his memo books for the time periods before and after the memo book documenting his activities on February 2, 2013. (Smith June 6, 2024 Tr. 22-23). Even if true, such sustained negligence further justifies an adverse inference instruction.

With respect to the text messages, upon finding that Defendants acted with the intent to deprive Plaintiff of the information's use in the litigation, Rule 37(e) expressly allows the Court to (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment. Even in the absence of that, upon finding prejudice to another party from loss of the information, the Court may order measures no greater than necessary to cure the prejudice.

At a minimum, Defendants should not be permitted to elicit testimony from any witness that the CI told Smith (or any member of the NYPD) that Mr. Walker told the CI that he would shoot at police officers if he were stopped by law enforcement. But given the egregious nature of the Defendants' failure to preserve any of Smith's documented communications with the CI – both in his memo book and the text messages themselves – a more significant sanction is warranted. The Court should instruct the jury that it must presume the information in Smith's memo book and in Smith and Gordon's text messages were each unfavorable to Defendants. *See Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F. Supp. 3d 570 (S.D.N.Y. 2017) (sanction of adverse inference instruction was warranted where former employee acted in bad faith or in a grossly negligent manner with respect to preservation of ESI).

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiff's motion in its entirety.

Dated: Brooklyn, New York
August 12, 2024

Respectfully Submitted,

Elizabeth Geddes
Nadia Shihata
Shihata & Geddes LLP
155 Water Street
Brooklyn, New York 11201

25